UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            v.<br><br>JOSE ROMAN,<br><br>                        Defendant. | S1 16 Cr. 311 (KMW) |

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Sarah Krissoff
Assistant United States Attorney
     *Of Counsel*

The Government respectfully submits this memorandum in opposition to the motion filed by the defendant, Jose Roman ("Roman" or the "defendant"), for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

It appears that the defendant will have exhausted his administrative remedies as of June 2, 2020, and the Court should deny the request for its lack of merit. Roman does not set forth any "extraordinary and compelling" reasons to support his argument that his immediate release from prison is appropriate, and the Section 3553(a) factors weigh strongly against such release.

## BACKGROUND

### I. The Charges, Plea, and Sentencing

Roman was arrested on or about October 5, 2016, as part of the take down of a violent street crew that referred to itself as "YNR," which sold narcotics and engaged in shootings and other acts of violence near 188th Street and Webster Avenue. PSR ¶¶ 19-20. Roman was charged in participating in a narcotics conspiracy responsible for distributing and possessing with intent to distribute one kilogram or more of heroin, and 280 grams or more of crack cocaine, in violation of Title 21, United States Code, Section 846 and 841(b)(1)(A). Ultimately, Roman, one of the crew's principal drug suppliers, pleaded guilty to the lesser included offense of participating in a narcotics conspiracy responsible for distributing and possessing with intent to distribute 100 grams or more of heroin, and 28 grams or more of crack cocaine, in violation of Title 21, United States Code, Section 846 and 841(b)(1)(B). PSR ¶¶ 2, 14. The defendant also possessed a firearm in connection with his participation in the conspiracy – a gun he provided to co-defendant Kenneth Rudge. Government Sentencing Submission, at 3; Sentencing Transcript at 19-22.

On or about April 25, 2018, this Court sentenced Roman principally to 97 months' imprisonment, and 4 years' supervised release. The evidence presented at sentencing

1

demonstrated that Roman was the principle heroin supplier to YNR, despite his knowledge of their violent proclivities and, that, in one instance, Roman provided a firearm to co-defendant Kenneth Rudge.  Government Sentencing Submission, at 3.  Roman is currently housed at FCI Danbury, and his current release date is August 25, 2023.

    II.    **Roman's Administrative Requests**

        1.    **Roman's Request to the Bureau of Prisons**

According to the paperwork from the Bureau of Prisons ("BOP"), Roman first submitted an administrative request for compassionate release or home confinement on or about May 2, 2020.  Roman was informed that he was ineligible for home confinement (due to the nature of his crime), and the request was returned to Roman a few days later, since Roman did not articulate a basis for compassionate release.  Roman re-submitted the request on or about May 10, 2020, and the BOP denied the request for compassionate release on or about May 12, 2020.  *See* Exhibit A (Roman's Medical Records), at 59; Exhibit B (BOP Compassionate Release Paperwork); Exhibit C (BOP Compassionate Release Paperwork).[1]

**ARGUMENT**

In his Motion, Roman fails to articulate any appropriate basis for compassionate release.  He argues only that Covid-19, in light of the close living conditions at FCI Danbury, poses a danger to his health.  Motion, at 2-3.  The defendant also states that his particular unit is a "hot zone" for Covid-19, and that he has obtained his GED and participated in programming while

---

[1] The Government is not filing Exhibits A, B, and C publicly, and respectfully requests that they be filed under seal.  Likewise, the Government respectfully requests that certain, limited portions of this brief, which reflect the defendant's medical information, also be filed under seal and that only a redacted copy of this brief be filed publicly.

2

incarcerated, without incurring any disciplinary infractions. *Id*.

While the defendant will have properly exhausted his administrative remedies under the statute as of June 2, 2020, Roman has not established extraordinary and compelling reasons for his release. By all accounts, Roman is very healthy and relatively young, with no particular risk factors for Covid-19. In addition, the § 3553(a) factors counsel against the defendant's release. Accordingly, the Motion should be denied.

## I.     Applicable Law

### A.     Compassionate Release Under 18 U.S.C. § 3582(c) (1)

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also United States v. Goode*, No. 14 Cr. 810 (CM), 2020 WL 58272, *1 (S.D.N.Y. Jan. 6, 2020); *United States v. Israel*, No. 05 Cr. 1039 (CM), 2019 WL 6702522, *1 (S.D.N.Y. Dec. 9, 2019). Prior to the enactment of the First Step Act (the "FSA"), a court could not modify a defendant's duly-imposed sentence on compassionate release grounds under 3582(c)(1) unless it received a motion from the BOP asking that the court consider such modification. *See, e.g., United States v. Goode*, 2020 WL 58272 at *1 (citing U.S.S.G. § 1B1.13 Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement) (Effective Nov 1, 2006; amended effective Nov. 1, 2007; Nov 1, 2010; Nov. 1, 2016; Nov. 1. 2018)); *Stewart v. United States*, 13 Civ. 5279 (JGK), No. 02 Cr. 395 (JGK), 2013 WL 4044756, *3-6 (S.D.N.Y. Aug. 9, 2013); *United States v. Iosifidis*, No. 13 Cr. 170 (JFK), 2016 WL 3267329, *2 (S.D.N.Y. June 9, 2016).

On December 21, 2018, Congress passed the First Step Act (the "FSA"), Pub. L. No. 115-391, which amended 18 U.S.C. § 3582(c)(1) to permit a court to consider a defendant's motion for compassionate release following the exhaustion of his or her administrative remedies

3

with the BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner:

> The court <u>may not modify a term of imprisonment once it has been imposed except that</u>, . . . the court, upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, <u>may reduce the term of imprisonment…</u>

18 U.S.C. § 3582(c)(1)(A) (emphasis added). The FSA did not amend the eligibility requirements for compassionate release, which are set forth in 18 U.S.C. § 3582(c)(1)(A) and Section 1B1.13 of the United States Sentencing Guidelines. The court can only modify a sentence if, "after considering the factors set forth in section 3553(a) to the extent they are applicable," it finds that "extraordinary and compelling reasons warrant such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i); or that the defendant is at least 70 years old and has served at least 30 years in prison, among other things. 18 U.S.C. § 3582(c)(1)(A)(ii). In either case, the proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13. It provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3); *see Dillon v. United States*, 560 U.S. 817, 827 (2010); 28 U.S.C. § 994(t) (delegating authority to U.S. Sentencing Commission to define "extraordinary and compelling reason").

The Application Notes describe specific circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. §1B1.13, Application Note 1. The first relates to the

4

defendant's own medical condition and requires that the defendant be: (1) suffering from a serious physical or medical condition; (2) suffering from a serious functional or cognitive impairment; or (3) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. U.S.S.G. §1B1.13, Application Note 1. The second applies when a defendant is at least 65 years old, is seriously physically or mentally deteriorating, and has served a prescribed amount of prison time. *Id.*, Application Note 1(B). The third applies when the caretaker of a defendant's minor child(ren) dies or becomes incapacitated, or the defendant's spouse or registered partner becomes incapacitated and the defendant would be the only available caregiver for the spouse or registered partner. *Id.*, Application Note 1(C). The fourth, entitled "Other Reasons," provides that compassionate release can be justified if "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with the reasons described in subdivisions (A) through (C). *Id.,* Application Note 1(D).[2]

---

[2] District courts in the Southern District of New York (and elsewhere) have found that, although not amended, § 1B1.13's descriptions of "extraordinary and compelling reasons" remain current. *United States v. Ebbers*, -- F.3d --, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Lisi*, 2020 WL 881994, *4 (S.D.N.Y. February 24, 2020) (§ 1B1.13's descriptions of "extraordinary and compelling reasons" remain current). Indeed, in *United States v. Ebbers*, the Court observed that § 1B1.13 is "at least partly anachronistic because it has not yet been updated to reflect the new procedural innovations of the First Step Act" in that it refers to a motion of the Director of the Bureau of Prisons. It is "nonetheless, helpful in defining a vague standard." *United States v. Ebbers*, 2020 WL 91399 at *4 (S.D.N.Y. Jan. 8, 2020). The Court found that "[a]lthough the history and text of the First Step Act suggest that Congress intended to broaden the availability of compassionate release (its title is 'Increasing the Use and Transparency of Compassionate Release'), Congress in fact only expanded access to the courts; it did not change the standard." *Ebbers*, 2020 WL 91399 at *4.

5

Application Notes 2 and 3 of § 1B1.13 are also relevant. Application Note 2 provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." Application Note 3 provides that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."

BOP Program Statement 50.50 ("PS 50.50") sets forth the administrative procedures the BOP will follow when considering inmate requests, as well as the substantive criteria the BOP uses to evaluate whether a motion is appropriate. The substantive criteria largely mirror the criteria set forth in § 1B1.13. There are no additional procedures for requests based on the "other reasons" category listed in Application Note 1(D).

Finally, regardless of the theory behind the "extraordinary and compelling" reason that a defendant proceeds under, the 18 U.S.C. § 3553(a) factors are relevant to whether compassionate release is warranted. *See* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

## I. The Court Should Deny Roman's Request for Compassionate Release

### A. Roman Will Have Exhausted His Administrative Remedies Shortly

Until a defendant has exhausted his administrative remedies, the Court lacks the authority to grant compassionate release.

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." *Id.* § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons ("BOP") or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

Section 3582(c)(1)(A)'s exhaustion requirement is therefore mandatory. It is critical, in this context, to note that Section 3582(c)'s exhaustion requirement is statutory, and thus is not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). By significant contrast, *statutory* exhaustion requirements "stand[] on a different footing." *Id.* There, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Id.* Thus, where a statute contains mandatory exhaustion language, the only permissible exceptions are those contained in the statute. *Id.*; *see also Bastek v. Fed. Crop. Ins.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As described above, Section 3582(c)(1)(A) contains mandatory exhaustion language with no statutory exceptions. The plain language of the statute makes clear that a court "may not" modify a sentence unless, as relevant here, the defendant has first "fully exhausted all administrative rights" or waited 30 days after transmitting his request to the warden. Unlike the Prison Litigation Reform Act ("PLRA"), for example, there is no statutory qualifier that a defendant need only exhaust all "available" remedies.[3] *See also* 28 U.S.C. § 2254(b)(1)(A) (habeas

---

[3] In particular, the PLRA demands that an inmate exhaust "such administrative remedies *as are available*," meaning that the only permissible exception to exhaustion is where the remedies are "unavailable." *Ross,* 136 S. Ct. at 1856-58 (emphasis added); *see also id.* at 1855 (criticizing the "freewheeling approach" adopted by some courts of appeals to exhaustion requirements, and

7

statute requires exhaustion of all remedies "available in the courts of the State"). Thus, Section 3582(c)(1)(A) is a mandatory exhaustion provision with no applicable exceptions. *Cf. Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims). As Circuit Judge Sullivan, sitting by designation, recently explained, Section 3582(c)'s exhaustion requirement is "clear as day" and is therefore mandatory. *United States v. Ogarro*, No. 18 Cr. 373 (RJS), 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020). Because it appears as if Roman first submitted his administrative request for compassionate release on or about May 2, 2020, he will have properly exhausted his administrative remedies as of June 2, 2020.

---

overruling precedent from the Second Circuit and other circuits that had read additional exceptions into the rule). Here, no such exception exists in the statute.

### B. Roman Has Not Established Extraordinary and Compelling Circumstances

In any event, the Court should nevertheless deny Roman's request for compassionate release. As noted above, in determining whether Roman should be granted a reduction in his sentence, the Court must consider whether the circumstances he has raised rise to the level of "extraordinary and compelling," whether he poses a danger to any other person or to the community, and the § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13.

Other than a general complaint about the risks of Covid-19, Roman has not identified any particularized extraordinary and compelling reasons for his release. Roman has not identified any reason why he is more susceptible to Covid-19, or any reason why he is at risk for a more severe presentation of the illness. He does not claim that he has any underlying health issues, and his medical records do not reflect any such issues. *See* Exhibit A. Consistent with this, at the time of his sentencing, the defendant was in good health with no medical issues. PSR ¶ 64. Roman simply makes a general argument about the dangerousness of Covid-19, which is not sufficient to warrant his release years in advance of his scheduled release date.

Because of his relatively young age – 35 – and the apparent absence of certain chronic illnesses, it does not appear that the defendant is at high risk for severe illness. All of the records reflect that he is in very good health. In addition, the BOP has gone to great lengths to limit the transmission of Covid-19 as much as possible in its facilities. According to the most recent information available at the BOP website, there are currently approximately 15 inmates and 2 staff members at FCI Danbury who are positive for Covid-19, as well approximately 72 inmates and 59 staff members who have recovered from Covid-19. There has also been one inmate death

9

at Danbury. ███████████████████████████████████████ and appears to have been moved from the unit about which he complains. *See* Exhibit A, at 43.

To be sure, the COVID-19 pandemic warrants serious attention. But there is no evidence, at this time, to suggest the BOP is not taking the pandemic seriously. To the contrary, the BOP has made significant efforts to respond. In particular, since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources.[4] Moreover, beginning over two months ago, in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan.[5] As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP stood up "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. The BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP, after coordination with DOJ and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures are intended to "ensure the continued effective operations

---

[4] Available at https://www.bop.gov/resources/health_care_mngmt.jsp
[5] Available at https://www.bop.gov/resources/news/20200313_covid-19.jsp

of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

That did not end the BOP's response. On March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See* BOP Update on COVID-19.[6] On March 26, 2020, the BOP implemented Phase Four, which entailed:

---

[6] Available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

11

(a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *See* BOP COVID-19 Action Plan: Phase Five.[7]

On April 1, 2020, the BOP implemented Phase Five, which entailed: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service (the "USMS") to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. *Id.*

It is the Government's understanding, from the BOP website and the regular, public updates posted there, that the BOP remains under significantly modified operations across the United States, in order to combat the spread of Covid-19. The BOP is also working actively to increase testing capabilities at its institutions.[8] All of these steps belie any suggestion that BOP is failing

---

[7] Available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

[8] *See* https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf.

to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates. To the contrary, it shows that the BOP has taken the threat very seriously, and has mitigated it to the extent possible.  While there is no question that inmates and staff members at FCI Danbury have suffered from Covid-19, the fact that Roman's entire former unit at Danbury was tested recently (and that Roman was subsequently moved) demonstrates the great effort that the BOP is taking to address the risks of Covid-19.  Exhibit A, at 1.

In light of the above, including Roman's good health, Roman simply has not demonstrated extraordinary and compelling reasons for his release.

### C. The Section 3553(a) Factors Weigh in Favor of the Defendant's Continued Detention

Even if the defendant had presented extraordinary and compelling reasons for his release – he has not – the same Section 3553(a) factors that the Court considered in imposing the defendant's original sentence continue to justify that sentence today and weigh against releasing the defendant. Releasing the defendant would undermine the purposes of sentencing – *i.e.*, to reflect the seriousness of the offense, the defendant's criminal history, and the need for specific and general deterrence – and would not be appropriate.  *See, e.g.*, *United States v. Credidio*, No. 19 Cr. 111 (PAE), ECF No. 62 (S.D.N.Y. Mar. 30, 2020) (denying motion for compassionate release and reduction of sentence to home confinement in light of COVID-19 pandemic for 72-year-old defendant sentenced in Feb. 2020 to 33 months' imprisonment because lengthy term of imprisonment was required for reasons stated at sentencing); *United States v. Denard Butler*, S9 18 Cr. 834 (PAE), ECF No. 461 (S.D.N.Y. Apr. 7, 2020) (denying motion for compassionate release in light of COVID-19 pandemic for defendant diagnosed with asthma because it would "disserve [the] important § 3553(a) factors" justifying the 60-month sentence previously imposed by the Court).

Here, the defendant's conduct was very serious, and occurred over an extended period of time. His role in the offense – as the prolific supplier of heroin to a very violent crew – and the fact that he also possessed a firearm in connection with the offense – demonstrate the danger he poses to society.

A reduction in Roman's sentence would not reflect the seriousness of his crimes, provide just punishment, promote respect for the law, and afford specific and general deterrence. The Government also notes that this defendant attempted to flee prosecution in this case in the immediate aftermath of the arrests of his co-defendants. After the Government contacted his then-girlfriend in an effort to locate the defendant, he fled to Florida, where he was ultimately arrested. *See* Dkt. No. 94 (Order of Detention). Roman's crime was serious, and warranted the sentence imposed by the Court, after careful consideration of all the 3553(a) factors, including Roman's relative role in offense. Reducing Roman's sentence now would undermine the message the Court originally sent in imposing his sentence.

## CONCLUSION

For the foregoing reasons, Roman's Motion for compassionate release should be denied.

Dated: New York, New York
May 29, 2020

                          Respectfully submitted,

                          GEOFFREY S. BERMAN
                          United States Attorney for the
                          Southern District of New York

By:    /s/ Sarah Krissoff
        Sarah Krissoff
        Assistant United States Attorney
        Tel.: 212-637-2232

cc:    Jose Roman (via certified mail)

15